## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BARBARA JEAN VERDOORN,　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　 Plaintiff,　　　 )
　　　　　　　　　　　　　　　　　　　 )　　 **CIVIL ACTION**
v.　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )　　 **No. 14-2038-JWL**
CAROLYN W. COLVIN,　　　　　　　 )
Acting Commissioner of Social Security,　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　 Defendant.　　　 )
_____ )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security

(hereinafter Commissioner) denying Disability Insurance benefits (DIB) under sections

216(i) and 223, of the Social Security Act.  42 U.S.C. §§ 416(i) and 423 (hereinafter the

Act).  Finding no error, the court ORDERS that judgment shall be entered pursuant to the

fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

I.　　**Background**

Plaintiff applied for DIB, alleging disability beginning January 9, 2008.  (R. 20,

182-86).  She exhausted proceedings before the Commissioner, and now seeks judicial

review of the final decision denying benefits.  She argues before this court that the

Administrative Law Judge (ALJ) erred as a matter of law in failing to accord appropriate

weight to the medical opinions of two treating physicians, Dr. Ogden and Dr. Clough;

erred as a matter of law in failing to evaluate Plaintiff's fibromyalgia properly; and erred as a matter of law and of fact in evaluating the credibility of Plaintiff's allegations of limitations resulting from her impairments and their symptoms.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether she applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by

other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v.

Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a

claim for disability.  20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th

Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a

determination can be made at any of the steps that a claimant is or is not disabled,

evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting

Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether

claimant has engaged in substantial gainful activity since the alleged onset, whether she

has a severe impairment(s), and whether the severity of her impairment(s) meets or equals

the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt.

P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner

assesses claimant's residual functional capacity (RFC).  20 C.F.R. § 404.1520(e).  This

assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process--

determining at step four whether, in light of the RFC assessed, claimant can perform her

past relevant work; and at step five whether, when also considering the vocational factors

of age, education, and work experience, claimant is able to perform other work in the

economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one

through four the burden is on Plaintiff to prove a disability that prevents performance of

past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord,

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

The court finds no error as alleged by Plaintiff in the Commissioner's decision. Because the ALJ's credibility determination affected her evaluation of the treating physicians' medical opinions, the court will address the alleged errors in the credibility determination first.  And, because Plaintiff claims the errors in evaluating fibromyalgia infected the ALJ's RFC assessment, the court will address the alleged errors in the ALJ's evaluation of fibromyalgia after it addresses the other alleged errors.

## II.     The Credibility Determination

Plaintiff's claims of error in the credibility determination are not absolutely clear. With regard to her claim of legal error, she argues that the ALJ failed to apply all of the factors for evaluating credibility and that although the ALJ attempted to provide specific reasons for her credibility determination, "her finding was not supported by the evidence in the entire case record."  (Pl. Brief 28) (emphasis in original).  As to the factual bases for the ALJ's credibility determination, Plaintiff argues that the ALJ misstated the facts. Particularly, she refers to the ALJ's focus "on Plaintiff's use of a wheelchair as 'a gross overstatement of her limitations' as opposed to considering all of the evidence in the record as a whole" (Pl. Br. 27) (quoting without citation R. 30); to the fact that Dr. Clough and Dr. Ogden did not question Plaintiff's use of a cane or of a wheelchair and

did not question her "allegations regarding her symptoms and limitations," id.; to the ALJ's acknowledgment of Plaintiff's excellent earning record; and to the ALJ's evaluation of the reasons Plaintiff stopped working.  (Pl. Br. 27-28).  The Commissioner argues that the ALJ reasonably found that Plaintiff's complaints of disabling pain were incredible, and that the record evidence supports the ALJ's credibility determination.

### A.      Standard for Evaluating Credibility

The framework for a proper credibility analysis is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987).  An ALJ must consider (1) whether the claimant has established a symptom-producing impairment(s) by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment(s) and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling.  See, Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993) (explaining the Luna framework).

The Commissioner has promulgated regulations suggesting relevant factors to be considered in evaluating credibility:  Daily activities; location, duration, frequency, and intensity of symptoms; factors precipitating and aggravating symptoms; type, dosage, effectiveness, and side effects of medications taken to relieve symptoms; treatment for symptoms; measures plaintiff has taken to relieve symptoms; and other factors concerning limitations or restrictions resulting from symptoms.  20 C.F.R. § 404.1529(c)(3)(i-vii). The court has recognized a non-exhaustive list of factors which overlap and expand upon the factors promulgated by the Commissioner.  Luna, 834 F.2d at 165-66.  These include:

the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson, 987 F.2d at 1489).

The court's review of an ALJ's credibility determination is deferential.  Credibility determinations are generally treated as binding on review.  Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983).  "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence.  Wilson, 602 F.3d at 1144; accord Hackett, 395 F.3d at 1173.  Therefore, in reviewing the ALJ's credibility determinations, the court will usually defer to the ALJ on matters involving witness credibility.  Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994); but see Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993) ("deference is not an absolute rule").  "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'"  Wilson, 602 F.3d at 1144 (quoting Huston v. Bowen, 838 F.2d 1125, 1132 n.7 (10th Cir. 1988)); Hackett, 395 F.3d at 1173 (same).

### B.    The ALJ's Credibility Analysis

The ALJ cited 20 C.F.R. § 404.1529 and Social Security Rulings (SSR) 96-4p and 96-7p as the legal authority upon which she based her credibility determination, and

explained the Commissioner's two-step process for making that determination.  (R. 25).

She summarized Plaintiff's allegations of symptoms and explained her evaluation of those

allegations.  (R. 25-30).  Within that evaluation the court discerns five reasons given by

the ALJ for discounting Plaintiff's allegations:  (1) Plaintiff exaggerated her symptoms;

(2) Plaintiff alleged her onset date of disability was January 9, 2008 but there is no

apparent basis for that date because Plaintiff pursued no treatment between October 25,

2007, and August 4, 2009; (3) the evidence does not establish that Plaintiff has weakness

in the legs sufficient to require the use of a cane, wheelchair, or scooter; (4) there is no

evidence of significant or disabling adverse side effects from medication; and

(5) although Plaintiff has a fairly good work history, her last job ended for reasons

unrelated to disability.  Four different times in her analysis, the ALJ noted that the

evidence does not establish leg weakness.  (R. 26-27).  She concluded that Plaintiff "is

not credible in alleging complete disability."  (R. 30).

### C.   Analysis

Plaintiff shows no error in the ALJ's application of the legal standard for

determining credibility.  The two-step procedure for evaluating credibility, as set out in

the regulations and cited by the ALJ, is equivalent to the Luna framework, and Plaintiff

does not argue otherwise.  Moreover, she does not argue that the ALJ did not apply that

standard.  Rather, she argues that the ALJ failed to apply all of the regulatory factors for

evaluating credibility.  However, Plaintiff's argument misunderstands the law in the

Tenth Circuit.  As the court acknowledged in Luna, no list of factors relevant to a

determination of credibility could be exhaustive.  <u>Luna</u>, 834 F.2d at 166.  Therefore, the law does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence she relied on in evaluating the claimant's credibility, the law is satisfied.  <u>Qualls v. Apfel</u>, 206 F.3d 1368, 1372 (10th Cir. 2000).

Plaintiff's argument that the ALJ's "finding was not supported by the evidence in the <u>entire</u> case record" (Pl. Brief 28), is no more than a thinly veiled suggestion that the court should reweigh the evidence regarding credibility.  It may not do so.  <u>Bowman</u>, 511 F.3d at 1272; <u>accord</u>, <u>Hackett</u>, 395 F.3d at 1172.  This is true of an ALJ's credibility determination perhaps more than any other finding because the ALJ was at the hearing and had the opportunity to observe the claimant first-hand.  Moreover, Plaintiff here does not explain what evidence was ignored, or why the evidence as a whole <u>cannot</u> support the ALJ's determination.  The mere fact that there is evidence which might support a contrary finding will not establish error in the ALJ's determination.  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  <u>Lax</u>, 489 F.3d at 1084 (citations, quotations, and bracket omitted); <u>see also</u>, <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966).

Plaintiff does not show error in the factual bases for the ALJ's credibility determination either.  Plaintiff complains that the ALJ provided excessive focus on

Plaintiff's use of a wheelchair, but she does not show that this focus was excessive or that it was erroneous. As Plaintiff argues, neither Dr. Clough nor Dr. Ogden questioned Plaintiff's decision to use a wheelchair. But it is that very unquestioning acceptance of Plaintiff's subjective reports that was one basis for the ALJ's determination to accord no weight to those physicians' opinions. Moreover, the ALJ specifically considered Dr. Clough's treatment notes from April 26, 2010 (Ex. 8F/5, R. 463), and November 8, 2010 (Ex. 8F/10, R. 468) and found that although those notes documented Plaintiff's reports of weakness in her legs and reliance on a cane or a wheelchair, there was no independent evidence cited to establish that weakness. (R. 26-27). She also considered Dr. Ogden's treatment notes and specifically found that although he recorded Plaintiff's report of weakness in her legs, there was nothing in the prior medical evidence or in Dr. Ogden's examination to confirm Plaintiff's report. (R. 27). She noted that Dr. Chilappa's rheumatology examination did not reveal leg weakness or a need for a cane or wheelchair. Id. Finally, the ALJ cited Dr. Arjunan's review of the record, in which he found that Plaintiff had complained of weakness but that there is no evidence documenting weakness as a clinical finding and there is no credible need for a wheelchair. (R. 28-29) (citing Ex. A4/11-13, R. 88-90). Substantial evidence supports the ALJ's findings in this regard, and although there is evidence from which she could have reached a different conclusion, Plaintiff does not show that the evidence compels a different conclusion.

Plaintiff is correct to suggest that the ALJ acknowledged Plaintiff's "fairly good work history," but she also argues that it was error to find that Plaintiff stopped working "for reasons unrelated to disability." (Pl. Br. 27-28) (quoting R. 30). The parties agree that Plaintiff's last job ended when her business went bankrupt, but Plaintiff argues that "a longitudinal review of the record" demonstrates that the bankruptcy was due to her disability. Id. at 27-28. The court does not agree.

The ALJ's characterization of Plaintiff's work history as "fairly good" (R. 30) more accurately reflects the evidence than Plaintiff's suggestion of an "excellent" work history. (Pl. Br. 27). The earnings record to which Plaintiff cites, demonstrates that Plaintiff had significant reductions in income in 1989-1990, and in 1995-1999. (R. 190).

The record reveals that the chapter 7 bankruptcy case regarding Plaintiff's business was Case Number 10-21669, and the final decree closing that case was entered on December 1, 2010. (R. 176). From these facts, it may be inferred that the bankruptcy was begun in 2010, before Plaintiff filed her application for DIB on January 20, 2011, but after her alleged onset date of disability--January 9, 2008. As the ALJ acknowledged, on April 26, 2010 Plaintiff had an office visit with Dr. Clough at which she "advised that she was having to declare bankruptcy for her business and that she has no medical insurance." (R.26) (citing Ex. 8F/5, R. 463). At the hearing, the ALJ asked Plaintiff when the business ceased, and she began to answer, "When the housing market, I think it was--," but the ALJ interrupted her and stated that she wanted a date when the business ceased. (R. 42). As Plaintiff suggests, these facts might be argued to provide marginal support for

10

her current assertion that the bankruptcy was caused by an increase in her functional limitations as her disabling impairments progressed. However, the same facts at least equally, and perhaps better, support the ALJ's conclusion that Plaintiff's job ended because of the business's bankruptcy and not because of her disability. When the evidence supports two inferences, and one of those was reached by the ALJ, the court cannot find error in the ALJ's finding. Plaintiff has shown no error in the ALJ's credibility determination.

III.    **Evaluation of the Treating Source Medical Opinions**

Plaintiff claims it was error for the ALJ to accord "no weight" to the medical opinions of Plaintiff's treating physicians, Dr. Ogden and Dr. Clough. She argues that even when a treating source opinion is not given controlling weight it must be given deference, that an ALJ must give specific, legitimate reasons for her decision, and that "there is no indication that the ALJ applied the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6) (2013)."  (Pl. Br. 20).

A.    **Standard for Evaluating Treating Source Opinions**

Plaintiff correctly argues that treating physicians' opinions should be evaluated in a particular fashion. A treating physician's opinion about the nature and severity of a claimant's impairments should be given controlling weight by the Commissioner if it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record. Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003); 20 C.F.R. § 404.1527(c)(2). When a treating physician's

opinion is not given controlling weight, the ALJ must nonetheless specify what lesser weight she assigned that opinion.  Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004).

A treating source opinion which is not entitled to controlling weight is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."  Watkins, 350 F.3d at 1300.  Those factors are:  (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  Id. at 1301; 20 C.F.R. § 404.1527(c)(2)-(6); see also Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing Goatcher v. Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995)).  However, the court will not insist on a factor-by-factor analysis so long as the "ALJ's decision [is] 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (quoting Watkins, 350 F.3d at 1300).

After considering the regulatory factors, the ALJ must give good reasons in her decision for the weight she ultimately assigns the opinion.  If she rejects the opinion

12

completely, she must give specific, legitimate reasons for doing so.  <u>Watkins</u>, 350 F.3d at

1301.

**B.      The ALJ's Evaluation**

In her decision, the ALJ summarized the medical evidence of record, including the

treatment notes of Dr. Ogden and Dr. Clough.  (R. 22-30).  Moreover, the ALJ

summarized the medical source statements provided by each of these physicians and

acknowledged that if accepted they would result in a finding that Plaintiff is unable to

perform any work.

> On August 3, 2011, after several visits since claimant first reestablished
> with him on March 31, 2011, (15F; 21F) her primary care physician, Dr.
> Richard Ogden, signed a medical sources statement containing extreme
> limitations including:  that claimant could lift/carry no more than 10 pounds
> and only could lift/carry 10 pounds for up to 10% of a workday: that she
> could sit at most 2/8 hours and stand or walk at most 1/8 hours, for a total of
> standing/walking/sitting for at most 3/8 hours; that she must constantly use
> a hand-held assistive device; that she had limited use of her hands and could
> seldom (up to 10% of a workday) handle, finger, or feel, although she could
> reach in all directions, including overhead frequently (up to 5 and 1/2
> hours); that she could reach overhead occasionally; that she has continual
> fatigue and pain and frequent vertigo; and that the limitations have been
> present since at least January 6, 2008.  In response to listing "objective
> clinical findings which could be expected to cause" the limitations, Dr.
> Ogden listed "Diffuse severe myofascial pain, pain in mid thoracic spine
> due to herniated discs, decreased ability to use upper extremities due to
> shoulder pain and limited range or motion."  (18F/4).
>
> This medical source statement is given no weight.  First, there is nothing to
> support Dr. Ogden's representation that the limitations have been present
> since at least January 6, 2008 (Claimant's alleged onset date of disability is
> January 9, 2008). Who provided him with that date?  His treatment records
> start on March 31, 2011 three years after this alleged onset date.  Moreover,
> in the examinations claimant had with Dr. Ogden from March through
> August 2011, he noted normal neurological exams (normal sensory and

cranial nerves grossly intact), normal range of motion, no deformity, and normal gait.  (15F/2, 6, 10; 21F/21, 28 (some tingling in 2 fingers on right hand), 32).  There is nothing in his medical records (or the medical evidence as a whole), including on the date that he filled out the medical source statement and examined the claimant (21F/14-18), that limits her ability to lift and carry at most 10 pounds for only 10% of the workday, and there is nothing to support a limitation in standing/walking/sitting for only 3 hours, meaning apparently that she must recline or lie down for the remaining 5 hours in an 8-hour day.  There is also nothing in the medical evidence that supports the use of a hand-held device (that is, a cane) "constantly."  Dr. Ogden limited the use of claimant's hands (handling, fingering and feeling only 10% of an 8-hour day), when there is no showing of any problems with her hands.  In essence, he reported that she can use her hands for only 48 minutes in an 8-hour day.  How is it that she has such limited use of her hands and yet must use a hand-held device constantly?  He inconsistently checked that she could reach in all directions, including overhead, frequently, and then checked that she could reach overhead occasionally.  He reported that she has continual fatigue and pain and frequent vertigo.  These are subjective complaints.  Other than her complaints of pain, Dr. Ogden's records (and the other medical evidence) do not include complaints of continual fatigue and frequent vertigo, and certainly no testing has been done related to these alleged symptoms.  As reasons for his extreme limitations, the doctor reported, among other things, pain in the mid thoracic spine due to herniated discs.  The claimant does not have herniated discs.  MRIs of the thoracic spine show "a small disc protrusion" at T7-8.  "There is no compression of the spinal cord."  Also seen was a caliber change in the cord at T5 but the cause was unknown.  (10F/7)  Importantly, Dr. Ogden noted the pain was in the mid thoracic spine.  There is no claim that the pain radiates to the arms or legs, which is consistent with the medical evidence reflecting generally normal neurological and physical examination.

(R. 27-28).

On January 9, 2012, neurologist John Clough, M.D., completed a medical source statement in which he opined, among other things, that claimant could seldom lift/carry 10 pounds; that she could sit for 2/8 hours, stand/walk for 2/8 hours, for a total of sit/stand/walk 4/8 hours; that she could frequently (up to 2/3 of the day) operate foot controls, that she must constantly use a handheld assistive device; that she can reach in all directions, including overhead, occasionally, and yet, can seldom reach

overhead; that she has continual fatigue, pain, and shortness of breath but no vertigo; and that her limitations were present since at least January 6, 2008.  In support of these limitations, Dr. Clough claimed weakness in arms, drops things in hands, reflexes greater on right upper extremity. (22F).

Dr. Clough's medical source statement is given no weight.  First, the claimant was last seen in his office (by a nurse) on March 29, 2011, over 9 months prior to the issuance of the statement, and not reflective of functioning in January 2012.  That exam reflected no changes except "[h]er reflexes are slightly greater on the right upper extremity compared to the left upper extremity."  (13F/3)  In fact, that information was also contained in the report of the only examination that Dr. Clough conducted--on August 4, 2009, over two years before he issued his medical source statement.  There is no physical examination conducted by Dr. Clough (and no other medical evidence) that supports the extreme limitations he assesses.  Second, Dr. Clough uses the date of onset as January 6, 2008, without any medical basis for using that date.  He did not see the claimant until August 4, 2009 (8F), over a year and 1/2 later.  And on that date, he noted that she had multiple complaints and "it is difficult as to tell what is what."  He did conclude, however, that, "I do not believe that she has shown symptoms of a progressive myelopathy.  Most of her back pain is midline and does not radiate."  "Most of her symptoms are vague in nature and difficult to pin down.  She has constant pain that goes from head to toe."  Finally, "I do not think that most of her complaints are due to cord or root."  (8F/2)  There is nothing in Dr. Clough's records or other medical evidence that limits claimant to less than sedentary work with an ability to sit/stand/walk for only 4 hours, meaning apparently that she must recline or lie down the remaining 4 hours in an 8-hour day.  He claimed that she has weakness in her arms and drops things in her hands, but his reports document fail to document [sic] weakness (or a basis for weakness) upon exam or problems with her hands.  His records also fail to document a need for a hand-held assistive device.  In short, it appears that Dr. Clough subscribed to the self-reporting of the claimant.  Her claimed limitations, however, are not supported by the evidence.

(R.29).

## C.    Analysis

15

Plaintiff does not explain what she finds to be the error as a matter of law in the ALJ's evaluation of the treating source opinions.  She appears to argue that because treating source opinions may be accorded controlling weight in certain circumstances, because they are generally worthy of deference, and because they are generally worthy of greater weight than other medical source opinions, it is legal error <u>per se</u> to accord a treating source opinion "no weight."  The court is aware of no such rule, and Plaintiff cites to no authority requiring such a holding.  While it is certainly unusual for a treating source opinion to be accorded "no weight," it is not error as a matter of law to do so.  Moreover, case law of the Tenth Circuit certainly contemplates such an eventuality, because on many occasions that court has noted that if a treating source opinion is rejected completely, the ALJ must give "specific, legitimate reasons" for doing so. <u>Knight ex rel. P.K. v. Colvin</u>, 756 F.3d 1171, 1177 (10th Cir. 2014); <u>Cowan v. Astrue</u>, 552 F.3d 1182, 1188 (10th Cir. 2008); <u>Branum v. Barnhart</u>, 385 F.3d 1268, 1275 (10th Cir. 2004); <u>Watkins</u>, 350 F.3d at 1301; <u>Drapeau</u>, 255 F.3d at 1214; <u>Miller v. Chater</u>, 99 F.3d 972, 976 (10th Cir. 1996); <u>Goatcher</u>, 52 F.3d at 290; <u>Washington v. Shalala</u>, 37 F.3d 1437, 1440 (10th Cir. 1994); <u>Sorenson v. Bowen</u>, 888 F.2d 706, 711 (10th Cir. 1989); <u>Williams</u>, 844 F.2d at 758; <u>Frey v. Bowen</u>, 816 F.2d 508, 513 (10th Cir. 1987); and <u>Byron v. Heckler</u>, 742 F.2d 1232, 1235 (10th Cir. 1984) (citing <u>Murray v. Heckler</u>, 722 F.2d 499 (9th Cir. 1983)).

Plaintiff does argue that there is no indication the ALJ applied the regulatory factors for evaluating treating physician opinions.  But, as quoted above, the ALJ

16

acknowledged at least that these are treating physicians, acknowledged the specialization

of the physicians, and considered the length and frequency of examination, the

supportability of the opinions, and the consistency of the opinions, both internally, and

with the record evidence.  There is no error in this regard.  Moreover, as noted above, the

court will not insist on a factor-by-factor analysis so long as the "ALJ's decision [is]

'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator

gave to the treating source's medical opinion and the reasons for that weight.'" Oldham,

509 F.3d at 1258 (quoting Watkins, 350 F.3d at 1300).  That standard is met here.

Finally, Plaintiff does not argue that the reasons given by the ALJ for discounting

the treating source opinions are not factually supported by the record.  Rather, she

explains how that the facts could have been viewed in a different light to accord them

greater weight.  This argument is no more than a suggestion that the court reweigh the

evidence and substitute its judgment for that of the ALJ.  As already explained above, it

may not do so.

## IV. Evaluation of Fibromyalgia

In her final argument, Plaintiff claims the ALJ erred as a matter of law in

evaluating her fibromyalgia.  Plaintiff argues that despite the ALJ's findings that Plaintiff

exaggerated her complaints and that many physical examinations revealed normal gait

and station, normal range of motion, and mostly normal reflexes and sensation, the

examinations relied upon by the ALJ also revealed signs and symptoms consistent with

fibromyalgia.  She cites SSR 12-2p ("Evaluation of Fibromyalgia"), West's Soc. Sec.

17

Reporting Serv., Rulings 460-68 (Supp. 2014), for the proposition that the examination findings relied upon by the ALJ are not significant in the evaluation of fibromyalgia, but that the SSR 12-2p points to other criteria which must be used to confirm the presence of fibromyalgia as a medically determinable impairment in a particular case.  She argues that the criteria in SSR 12-2p are revealed in the examinations relied upon by the ALJ in this case, and that it was, therefore, error for the ALJ to rely upon gross exaggeration of limitations, normal gait and station, normal range of motion, and mostly normal reflexes and sensation.  She argues that the ALJ failed to consider how Plaintiff's depression, anxiety, and fatigue were related to her fibromyalgia or were further evidence of fibromyalgia, and failed to include limitations in the RFC assessed which would account for depression and fibromyalgia.

The Commissioner argues that the ALJ properly evaluated Plaintiff's fibromyalgia and found it to be a severe impairment in this case.  She argues that although Plaintiff seems to allege that the diagnosis of fibromyalgia, by itself, is enough to confirm disability, that is not the case, since fibromyalgia is a relatively common disease which is not normally disabling.  She argues that the ALJ did not find the evidence (of normal gait and station, normal range of motion, and mostly normal reflexes and sensation) negated the diagnosis of fibromyalgia, but that it demonstrated that Plaintiff's symptoms are not as severe as alleged.  She points out that the ALJ considered and evaluated the opinion of the consultative psychologist regarding depression and anxiety, and the ALJ noted that Plaintiff's doctors did no testing with regard to her alleged fatigue.  She argues that in the

18

circumstances, the ALJ properly evaluated Plaintiff's fibromyalgia and determined that although it caused limitations in Plaintiff's capabilities, it was not of disabling severity.

### A.      The ALJ's Findings with Regard to Fibromyalgia

The ALJ found that Plaintiff has three severe impairments:  obesity, disorder of the thoracic spine, and fibromyalgia.  (R. 22) (finding no. 3).  She also found that Plaintiff made "no showing of severe impairments involving the hips and shoulders," and that Plaintiff's medically determinable mental impairments of depression and anxiety are not severe.  (R. 23).  In reaching these conclusions, the ALJ accorded significant weight to the opinion of Dr. Koeneman, the psychologist who provided a report of a consultative examination he performed.  Id.  She quoted Dr. Koeneman's conclusion that Plaintiff has no mental impairments that would prevent employment, that Plaintiff's mood disorder would likely not prevent her from obtaining or maintaining employment, and that if her physical health would permit it, Plaintiff "appears capable of maintaining a regular work schedule."  Id. (quoting Ex. 19F, R.530).  She determined that Plaintiff has the RFC for light work, which requires lifting no more than 20 pounds at a time with frequent lifting and carrying of no more than 10 pounds, and with a good deal of  standing or walking, or sitting most of the time with some pushing or pulling of arm or leg controls.  She determined that Plaintiff is also limited to work requiring only occasional climbing of stairs and ramps, only occasional stooping, kneeling, crouching, and crawling, and which does not involve even moderate exposure to extreme cold and wetness.  Id. at 25.

The ALJ recognized that on this record, Plaintiff was first diagnosed with fibromyalgia by a rheumatologist, Dr. Huston, in January 2010 when she "had typical findings of fibromyalgia with tenderness in all tender points specified by the ACR [(American College of Rheumatology)] for the diagnosis of fibromyalgia." (R. 26) (quoting (Ex. 9F/5, R. 475). She noted that on April 26, 2010 Plaintiff reported to her neurologist, Dr. Clough, that Dr. Huston had started her on Lyrica for fibromyalgia which had improved her overall pain. Id. (citing Ex. 8F/5, R. 463). She recognized that Plaintiff was once again diagnosed with fibromyalgia on September 4, 2010[1] at the Health Partnership of Johnson County. Id. (citing Ex. 10F/1, R. 477).

The ALJ also summarized Dr. Ogden's specific treatment notes with regard to fibromyalgia. She noted that when Plaintiff went to see Dr. Ogden to reestablish her treatment on March 31, 2011, Dr. Ogden stated that, "Pt. [(patient)] has all of the 18 tender points of fibromyalgia [tender[2]] and none of the control points." (R. 27) (quoting 15F/2, R. 500). She noted that Plaintiff saw another rheumatologist, Dr. Chilappa on June 1, 2011, for a rheumatology opinion. Id. She noted Dr. Chilappa's finding that Plaintiff had a negative physical exam for inflammatory arthritis, and that he found good range of motion in hips and shoulders and recommended low impact toning and stretching

---

[1]Although a progress note from September 4, 2010 appears on this page of the record, the diagnosis of fibromyalgia appears in the first paragraph on the page, and that progress note appears to be from a visit on September 15, 2010, or later. (R. 477). The ALJ's error, if any, in relating the specific date of the diagnosis is harmless.

[2]The ALJ omitted this word which is in Dr. Ogden's treatment note. (R. 500).

exercises and physical therapy for the shoulders and thigh muscles.  (R. 27).  She noted

that "Dr. Ogden's records (and the other medical evidence) do not include complaints of

continual fatigue and frequent vertigo, and certainly no testing has been done related to

these alleged symptoms."  Id. at 28.  She accorded "significant weight" to the medical

opinion of the state agency non-examining physician, Dr. Arjunan, and quotes his

explanation of the evidence:

> Overall, the evidence indicates that there are only a few minor physical
> problems with no exams showing significant neurological signs such as
> actual loss of strength, significant changes in reflexes or sensation, etc.  The
> records do show clmt [(claimant)] complains of weakness multiple times,
> but no exam documents this as a clinical finding.  She repeatedly alleges
> Thoracic spine problems and does have some changes in the T [(Thoracic)]
> spine but no compression to cause actual symptoms.

(R. 28-29) (quoting Ex. 4A/11, R. 88).  She notes that Plaintiff told Dr. Ogden on October

28, 2011 "that overall pain of fibromyalgia was tolerable with Lyrica and oxycodone."

Id. at 29 (citing Ex. 23F/6).[3]  The ALJ concludes: "claimant's complaints of severe

overall and disabling pain are not supported by the evidence.  She has limitations due to

fibromyalgia, obesity, and disorders of her thoracic spine. Those I [sic] impairments,

however, do not render her disabled and are taken into account in the residual functional

capacity assessment."  (R. 30).

B.     Analysis

---

[3]Dr. Ogden's treatment note dated October 28, 2011 does contain this information,
but it is in Ex. 21F/6, not Ex. 23F/6.  (R. 549).

The court finds no error in the ALJ's evaluation of fibromyalgia.  There can be no doubt that the ALJ found that Plaintiff has the medically determinable impairment of fibromyalgia, and that impairment is severe within the meaning of the Act and regulations in this case.  The ALJ's consideration of factors and findings to which Plaintiff objects-- that Plaintiff exaggerated her complaints and that many physical examinations revealed normal gait and station, normal range of motion, and mostly normal reflexes and sensation--do not reveal an indication that the ALJ was denying that Plaintiff has fibromyalgia, that fibromyalgia is not severe in this case, or that the ALJ did not properly consider fibromyalgia.  Rather, they were a part of the evidence relied upon by the ALJ to show that Plaintiff did not have severe impairments involving the hips and shoulders, that Plaintiff's allegations of symptoms resulting from her alleged impairments (particularly the disorder of her thoracic spine and Plaintiff's allegation of weakness in her arms and legs) were not as limiting as she alleged, and that the Dr. Ogden's and Dr. Clough's medical opinions were worthy of no weight.

Plaintiff's argument that there is no indication the ALJ considered depression and fibromyalgia in assessing RFC is manifestly incorrect.  The ALJ specifically noted that "depression and anxiety do not cause more than minimal limitations in her ability to perform basic mental work activities."  (R. 23).  Moreover, at least partly in accommodation of fibromyalgia, the ALJ limited Plaintiff to only light work with only occasional stooping, kneeling, crouching, crawling, or climbing of ramps and stairs, and with no climbing of ladders, ropes, or scaffolds, and she specifically acknowledged that

22

Plaintiff "has limitations due to fibromyalgia, obesity, and disorders of her thoracic spine. Those I [sic] impairments, however, do not render her disabled and are taken into account in the residual functional capacity assessment."  (R. 30).  Plaintiff has shown no error in the ALJ's consideration of her fibromyalgia.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 10th day of March 2015, at Kansas City, Kansas.


s:/ John W. Lungstrum_____
**John W. Lungstrum**
**United States District Judge**